## ABRAM KELSEY v. BELLE M. LAYNE.

1. PARTY, *Impeachment of.* The fact that a witness sought to be impeached is also a party to the suit, does not change the rule in respect to the manner of impeachment.

2. IMPEACHMENT *of Witness; Practice.* While it is undoubtedly true that before a witness can be impeached by proof of contradictory statements outside the court room, the attention of the witness must first be called to the time, place and person involved in the supposed contradiction, yet it is unnecessary that the exact hour or day be named; it is sufficient, if time, place and person are made so definite that there is a reasonable certainty that the recollection of the witness will be refreshed, and his attention directed to the alleged conversation.

3. AGISTER, *Lien of.* Where it appears that for three or four years a farmer has been keeping, feeding and caring for stock belonging to a neighbor, such farmer will be entitled to the protection of § 2, of ch. 58, Comp. Laws 1879, and to a lien upon the stock for his feed and care, and this notwithstanding it may appear that he fed and pastured no other stock for third parties, and that the number of stock belonging to such neighbor so kept and cared for at no time exceeded twelve in number.

*Error from Washington District Court.*

ACTION brought by *Kelsey* against *Layne,* to recover the possession of six head of cattle. Trial at the November Term, 1880, of the district court, and judgment for defendant. *Kelsey* brings the case here. The opinion states the facts.

*J. W. Rector,* and *E. A. Berry,* for plaintiff in error.

*Joseph G. Lowe,* and *T. J. Hume,* for defendant in error.

The opinion of the court was delivered by

BREWER, J.: This was an action of replevin, brought by plaintiff in error (plaintiff below) to recover the possession of six head of cattle. On the trial in the district court verdict and judgment were for defendant, and the plaintiff brings the case here for review. Four errors are alleged, two only of which do we deem it necessary to consider. The first arises on the ruling of the court in respect to the admission of the testimony. In order to fully understand this question, a brief statement of some of the principal facts is necessary. Defendant owned and managed a farm, on which she kept quite an amount of stock. From 1875 to 1880 plaintiff had been working for her, a part of the time on his own place and part of the time living with her on her farm. According to his testimony he worked the first three and a half years by the month, and after that he lived upon her place and · looked after the business, but did not work by the month, though the exact nature of the arrangement between them is not stated. During all this time he had more or less stock, which, part of the time at least, was kept on her farm. Of the six cattle in controversy she claimed to own five, and also claimed a lien on the sixth for its feeding and care, and this claim was sustained by the verdict of the jury. In her defense she testified that in the winter of 1879 the plaintiff had six head of cattle, but only one of them was in this suit. She was then asked by plaintiff on cross-examination this

question: "Did you tell Mr. Å. Hayes and his wife, in the month of August, 1879, that Kelsey then had thirteen head of cattle at your place, and could not have them until he settled with you?" And she answered that she did not tell them that, or any such thing, then or at any other time or place, or any other thing of the kind. She was also asked this question: "Did you say to Jake Rosebaugh, in the presence of plaintiff Kelsey, in the winter of 1879 and 1880, at your house, that Kelsey had twelve head of cattle at your place, and that if Kelsey would go away from home and attend to some business for you, you would have your son Jimmy and Don Owen attend to Kelsey's cattle while he was gone?" To which she answered: "I never did tell him that then, or at any other time, or anything of the kind." After the defendant had finished, plaintiff called A. Hayes, who testified that in August, 1879, he had a talk with the defendant at his house about the cattle Kelsey owned. Plaintiff then asked the question: "State whether or not the defendant told you and your wife in your house in the month of August, 1879, that Kelsey had thirteen head of cattle at her place, and could not have them until he settled with her."

This question was objected to, and the objection sustained. A corresponding question was asked to Jake Rosebaugh, and a similar ruling was made. Was this ruling erroneous? Counsel for defendant contend that it was not, for two reasons: *First*, because no proper foundation was laid; and *second*, because it was not impeaching evidence, but a part of plaintiff's original case. It is conceded that the general rule prevailing in this country, recognized in all the states with perhaps one or two exceptions, and in force in this state, is, that before impeaching testimony of that character can be offered, the attention of the witness who is sought to be impeached must first be called to the time, place and person involved in the supposed contradiction. (1 Greenl. Ev., 13th ed., § 462.) In each of these cases in the preliminary question to the defendant, the exact place and person were named. The

only indefiniteness was as to the time. In the one case sim-
ply the month was given, and in the other the
winter season. Is this such indefiniteness as pre-
vents the introduction of impeaching testimony?

<div style="margin-left:0"><em>1. Party, im-<br>peachment<br>of.</em></div>

We think not. The purpose of requiring these preliminary
questions is, to call the attention of the witness to the matter,
so that if any explanation can be given it may then be given;
and all that is necessary is to make the time, place
and person so definite that with reasonable cer-
tainty the memory of the witness may be re-

<em>2. Impeachment<br>of witness;<br>practice.</em>

freshed and directed to the circumstances of the alleged
conversation. Now if the defendant at the house of Mr.
Hayes had had, during the month of August, 1879, any con-
versation in respect to the cattle owned by plaintiff, she could
hardly have forgotten it. Her recollection would have been
little if any refreshed if the exact hour and exact day had
been named; and the same may be said as to her conversa-
tion in her own house with the witness Rosebaugh, in the
presence of the plaintiff. It is a universal rule that the cir-
cumstances of a transaction are more easily remembered than
the exact hour or day upon which they took place, and if for
the purposes of impeachment absolute exactness of date is re-
quired, it would often render such testimony immaterial. It
is not to be presumed that witnesses who may remember a
conversation will always be able to state the exact day or
hour upon which it took place. We think therefore this
ground for sustaining the ruling of the court is not tenable.
(Wharton's Ev., §§ 536–555.) As this was the only ground
of objection raised in the court below to the introduction of
this testimony, it is perhaps not really necessary to consider
the further point for the first time presented in this court,
yet that ground we also think is untenable. We understand
that the rules in respect to the impeachment of witnesses by
proof of contradictory statements are not changed by the
fact that the witness sought to be impeached is also a party,
(*Varona v. Socarras*, 8 Abb. Pr. 302,) and the fact that the
admissions of the defendant might have been introduced by

the plaintiff in his evidence in chief, does not necessarily prove that they are not also admissible as testimony in rebuttal. It may also be very much doubted whether these statements in reference to the number of cattle owned by Kelsey and kept by defendant, bear so directly upon the question of plaintiff's ownership of these cattle in controversy, as to have been admissible as original evidence. They contained no direct reference to these cattle, and it is only in connection with her testimony as to the number of cattle Kelsey had that her different statements outside the court room became material. Taken in connection with such testimony they are material, and where a case rests upon such contradictory and conflicting testimony as the one at bar, they might have weight with a jury in reaching a conclusion. We think the court erred in ruling out this testimony; that the error was material, prejudicial to the rights of the plaintiff; and upon this account the case must be reversed, and the case remanded for a new trial.

The only other question we deem it necessary to notice arises upon defendant's claim of a lien for feeding and care upon the single animal which the jury found belonged to the plaintiff. Plaintiff contends that notwithstanding the defendant had kept this animal and fed and cared for it, she had, in the absence of a special contract therefor, no lien for the value of such feeding and care. This contention is based upon the proposition that at common law the agister had no lien for the pasturage of cattle, and that the statute only gives such a lien to those who make a business of feeding cattle. It may be conceded that at common law one who had pastured cattle had, in the absence of special contract, no lien therefor. Edwards in his work on Bailments, page 279, thus states the law in respect to bailments: "The bailee for hire has his lien for his reasonable charges whenever by his labor and skill he has imparted additional value to the goods. This rule does not extend to the farmer who receives the horses or cattle of another to pasture, unless there be an agreement to that effect." In support of this he cites *Chapman v. Allen*, Cro. Car. 271;

*Yorke v. Grenaugh*, 2 Lord Raymond, 868; *Judson v. Ether-edge*, 1 Cromp. & Mees. 743.   See also the American cases of *Lewis v. Tyler*, 23 Cal. 364; *Goodrich v. Willard*, 7 Gray, 183; *Willis v. Barrister*, 36 Vt. 220; *Bissell v. Pearce*, 28 N. Y. 252.   Our statute (Comp. Laws 1879, ch. 58, §·2) reads: "The keepers of livery stables and all others engaged in feeding horses, cattle, hogs, or other live stock, shall have a lien upon such property."   Counsel would construe this as reading, keepers of livery stables and all others engaged in the *business* of feeding horses, etc., and argue that these last words include only those who make it a regular business, either exclusively or partially, to feed stock.   As the first term is a term descriptive of an employment, the other words must also refer to a similar employment; and they urge that it would be an unwarranted extension of the language to apply it to the case of a farmer who takes a single steer or horse of his neighbor to pasture. (*Conklin v. Carver*, 19 Ind. 226; *Alt v. Weidenberg*, 6 Bosw. 176.)

There is force in this argument, and especially when we consider simply the grammatical arrangement of the words; and yet we shall not absolutely decide this question, for we are constrained to think that even upon the plaintiff's theory, the defendant must be adjudged to be within the protection of the statute.   And first we may remark that the rule of the common law, though unquestionably established as above stated, does not rest upon the soundest foundation, and has at least been questioned.   In the later editions of Story on Bailments the rule is stated as above, but with a *query*. (Story on Bailments, § 443.)   In the case of *Hoover v. Epler*, 52 Pa. St. 522, the court, by Thompson, Judge, uses this language :

3. Agister's lien.

"Gibson, C. J., in *Steineman v. Wilkins*, 7 W. & S. 466, in treating of the doctrine of liens by warehousemen and bailees, notices, with seeming satisfaction, the extension of it to other than bailments for skilled labor, or *locatio operi faciendi*, when something is to be done upon the thing bailed by one skilled, citing *Bevan v. Waters*, Moo. & M. 235, in which a trainer was allowed to retain for fitting a race horse for the turf, and

doubts the doctrine of the cases in England which deny that the agister of cattle has a lien. The foundation upon which this seems to rest is the idea above stated, to wit, that the lien results from labor and skill, and not from the improved condition of the thing bailed by the labor and care of an unskilled bailee. 'It is,' he said, 'difficult to find an argument for the position that a man who fits an ox for the shambles, by fattening it with his provender, does not increase its intrinsic value by means exclusively within his control.' Certain it is, that the doctrine of liens in favor of bailees is not retrograding, but advancing, and is a wholesome restraint on the credit system, which is generally injurious in individual transactions to both parties. Ch. J. Best, in *Jacobs v. Latour*, 5 Bingham, 132, said that 'the doctrine is so just between debtor and creditor, it cannot be too much favored.' So in *Kirkman v. Shawcross*, 6 T. R. 17, Lord Kenyon said 'it had been the wish of the courts in all cases and at all times to carry the lien of the common law as far as possible.' "

In that case a party who hired as a groom to take charge of a horse, while refused a lien for his services as groom was awarded a lien for the feed, keeping and shoeing of the animal, which should have been furnished by the owner. See also *Lord v. Jones*, 24 Me. 439; *Harris v. Woodruff*, 124 Mass. 205. Again, the theory of the common law was, that if the labor and skill of the bailee increased the value of the article bailed, he had a lien. In other words, it was the profit of the bailor and not the loss of the bailee which determined the lien. Now it would seem far more just that when the bailee parted with anything, either property or labor, at the instance of the bailor, he should be protected irrespective of the question whether such property or labor increased the value of the thing bailed, or simply preserved it in existence. Oftentimes indeed, as suggested by C. J. Gibson in the quotation just made, the feeding and care of the agister actually increase the intrinsic value. Further, it may be remarked that the general tendency of all legislation and adjudication is to afford protection to him who parts with labor or material for the benefit of another. Witness the various mechanics-lien laws for the protection of those who bestow labor or furnish material for the improvement of real

estate, the law requiring railroads to give a bond to secure the payment of all laborers, and the statutes like the one now in consideration before us. These statutes, which rest upon obvious considerations of justice, are to be reasonably construed in order to accomplish the ends intended. Now it appears from the plaintiff's testimony that the defendant had for a series of years been keeping and feeding his stock. This is not a case where a farmer has only for a single season pastured a single head of stock for a neighbor, but where for year after year the party has pastured and fed several head of stock. It is true that she only did this for one person, but still she did it to such an extent and for such a length of time that it seems to us she comes fairly within the protection of the statute. She was engaged in feeding his stock. That, *pro hac vice*, may be considered her business. No one would for a moment seriously contend that a party must engage in it as an exclusive business before becoming entitled to the protection of the statute. Suppose, as in the case of *Brown v. Holmes*, 13 Kas. 482, that 92 cattle were wintered for a single person: could it be said for a moment that the agister was not engaged in the business of feeding and taking care of cattle, simply because he had only the cattle of one person? So in this case, while the number of cattle is not so great, yet the length of time is much greater. We think therefore the ruling of the district court was right, and that the defendant was fairly within the protection of the statute.

The other two matters complained of will probably not arise on a subsequent trial, and need not therefore be noticed. For the error above mentioned the judgment of the district court will be reversed, and the case remanded with instructions to grant a new trial.

All the Justices concurring.