WORTHINGTON MEIXELL V. S. S. KIRKPATRICK.

1. OPENING DEFENSE, *After Evidence in Rebuttal.* After a defendant has rested his case and the plaintiff has given impeaching evidence in rebuttal, the defendant is not entitled, as a matter of right, to open up his defense and give further evidence in support thereof.

2. CONVERSION; *Measure of Damages.* The measure of damages for the conversion of municipal bonds, is *prima facie* their face value, if no market value is shown. When the market value is shown, that is to be deemed the measure of damages in any action for conversion. (*Meixell v. Kirkpatrick,* 29 Kas. 679.)

3. ——— *Market Value.* Market value signifies a price established by public sales, or sales in the way of ordinary business.

4. ——— Proof of two anomalous sales of municipal bonds does not establish the market value of the bonds.

5. ——— A single sale of an over-due coupon of a municipal bond is not sufficient evidence to fix the market value of the bond.

6. MUNICIPAL BONDS — *Sale — Notice to Purchaser.* Where certain municipal bonds were sold on June 15, 1877, to K., under a contract by which F. gave to K. the refusal for $3,100, to be paid any time before July 1, 1877, and on June 17 or 18, 1877, one M. had notice of this contract, and prior to July 1, 1877, purchased the bonds of F., *held,* that M. took the

bonds subject to all the rights of K., and that K., upon a tender of the contract-price of the bonds prior to July 1, 1877, was entitled to them whether they were in the possession of F. or M.

7. ———— *Unlawful Possession; Conversion.* Where a defendant has possession of the personal property sued for, and without any right which the law will recognize, insists that he purchased and paid for the property, that the same is his own, and that the plaintiff does not own it, he becomes liable thereby for the conversion of the property.

8. REPLEVIN; *Property Held by Associate of Defendant; Liability.* Where it is shown that the defendant in an action of replevin had, prior to the commencement thereof, entered into an arrangement with others to wrongfully detain the property sued for from the plaintiff—who was the owner—and also to unlawfully deprive said plaintiff of its possession, a judgment for the recovery of the property or its value, against the defendant, is not erroneous, although the property at the commencement of the action was in the actual custody of his associate, if the defendant, at said time, had such control of the property that he could have caused a delivery of it to its owner, if he had pleased so to do.

## Error from Wilson District Court.

On June 15, 1877, J. L. Forsyth was the owner of eight municipal bonds—six thereof being each for one thousand dollars, issued in 1873, by Cedar Rapids township, in Wilson county, and payable to the Memphis & Northwestern Railroad Company, or bearer, in thirty years from the date thereof, and bearing interest at the rate of 7 per cent. per annum, payable semi-annually—coupons for such interest being thereunto attached; one bond thereof for one thousand dollars, issued in April, 1873, by Center township, in said county, and payable to the said railroad company, or bearer, in thirty years from the date thereof, and having thereunto attached interest coupons at the rate aforesaid; one bond thereof for one thousand dollars, issued in April, 1873, by the city of Fredonia, in said county, with interest at the rate of 10 per cent. per annum, payable semi-annually, coupons for such interest being thereto attached; the number of coupons attached to the bonds were about forty.

On July 3, 1877, *S. S. Kirkpatrick* brought his action in the district court of Wilson county against Angell Matthewson, *Worthington Meixell* and J. L. Forsyth, in replevin, to

recover these bonds. In his petition he alleged that in case a delivery of the bonds could not be had, that he should recover the sum of ten thousand dollars therefor, together with the sum of one thousand dollars as his damages. Subsequently plaintiff obtained leave to file separate petitions against the defendants, Meixell and Matthewson. Forsyth died November 15, 1878. On October 22, 1877, a separate amended petition was filed by Kirkpatrick against Meixell, praying for a recovery of the bonds or their value. A separate amended petition was filed, also, against Matthewson. At the February Term, 1878, of the district court, the defendant Meixell failing to demur or answer, judgment was rendered against him, and for the plaintiff, for the recovery of the bonds sued for, or their value—$9,475, and costs. On application of the defendant, the court ordered that the judgment should be set aside and vacated, upon the condition, however, that the defendant had a valid defense to the plaintiff's action. The court also ordered that the defendant should file an answer setting forth his defense, and that plaintiff have leave to reply thereto. The defendant filed an answer, and the plaintiff replied to the same. Trial had at the May Term, 1879, of the district court. The court held, over the objection of the defendant, that the defendant had the burden of proof. The jury returned a verdict for the plaintiff and against the defendant, and also found that the value of the bonds was $9,275. This judgment was reversed at the January Term of this court for 1881, upon the ground that the court below erred in holding that upon the defendant rested the burden of proof. (*Meixell v. Kirkpatrick*, 25 Kas. 13.)

Subsequently Meixell brought his action against Kirkpatrick and the sheriff of Labette county, to perpetually enjoin the enforcement of the judgment obtained by Kirkpatrick against him in Wilson county. Trial had at the November Term, 1879, of the district court of Labette county. Thereon judgment was rendered for the defendants, and Meixell brought his case to this court for review. The judgment of the trial

court was affirmed at the January Term of this court for 1881. (*Meixell v. Kirkpatrick*, 25 Kas. 19.)

Again, in a case of *Meixell v. Kirkpatrick*, pending in the district court of Labette county, the defendant demurred to the petition, which was sustained by the district court. Thereupon Meixell brought that case to this court for reversal; the judgment sustaining the demurrer was affirmed. (*Meixell v. Kirkpatrick*, 28 Kas. 315.) In the case of *Kirkpatrick v. Matthewson*, for the recovery of the bonds or their value, certain arrangements were had between the plaintiff and defendant Matthewson, against whom a judgment had also been obtained, which resulted in the assignment of the judgment against Matthewson to his wife. (*Meixell v. Kirkpatrick*, supra.) At the May Term, 1881, of the district court of Wilson county, trial was again had of the issues in the case originally brought by Kirkpatrick against Meixell, which resulted in a judgment of $7,500 for the plaintiff. Meixell brought that case to this court. That judgment was reversed on account of an erroneous instruction given to the jury as to the measure of damages. (*Meixell v. Kirkpatrick*, 29 Kas. 679.) After the judgment in that case was reversed, the cause was continued to the September Term of court for 1883. Trial commenced on the 13th day of said month, before the court with a jury; the jury returned a verdict that the plaintiff was the owner, and entitled to the possession of the bonds in controversy, and in case the bonds could not be returned, that the plaintiff should recover of the defendant the sum of $8,430, as the value of the bonds. The jury also returned the following special findings:

"1. On the 15th day of June, 1877, did J. L. Forsyth have full power and authority to sell and dispose of the bonds and coupons in controversy? A. Yes.

"2. On said 15th day of June, 1877, did said Forsyth have said bonds and coupons on deposit in the First National Bank of Parsons, Kansas? A. Yes.

"3. On said 15th day of June, 1877, did J. L. Forsyth execute and deliver to plaintiff the bill of sale introduced in evidence, marked 'Exhibit A'? A. Yes.

"4. Did plaintiff and said Forsyth on said 15th day of

June, 1877, deposit a copy of said bill of sale with said bonds and coupons at said First National Bank of Parsons, and have an understanding with Angell Matthewson, cashier of said bank, that he would receive the purchase-price, viz., $3,100, and deliver said bonds and coupons to plaintiff according to the terms of said bill of sale? A. Yes.

"5. Was the defendant, Meixell, a director of said bank, and did G. W. Hawk, another director, and teller of said bank, inform said defendant between the 15th and 30th days of June, 1877, that the plaintiff had contracted for said bonds and coupons? A. Yes.

"6. On the 30th day of June, 1877, did said Matthewson, without plaintiff's consent, sell said bonds and coupons to defendant, and did said Matthewson, after said sale, retain control of said bonds and coupons in said bank as the property of Meixell? A. In our opinion he did not sell said bonds, but he did retain them in his possession.

"7. Did the defendant give his check to said bank for the purchase-price of said bonds and coupons? A. In our opinion he did not.

"8. Did defendant have any money in said bank, subject to said check, sufficient to pay said check on June 30, 1877? A. No.

"9. Did said defendant first furnish funds to pay said check on July 2, 1877, and was said check paid on July 2, 1877? A. No.

"10. On June 30, 1877, did plaintiff tender $3,100 to said Angell Matthewson at said bank, and demand said bonds and coupons? A. Yes.

"11. Did said Matthewson on said 30th day of June, 1877, and after the demand for the bonds and coupons by plaintiff, notify the defendant of such demand, and advise him to give the bonds and coupons up to plaintiff? A. Yes.

"12. Did Matthewson offer to restore to defendant all that he had given for the bonds and coupons, if he, defendant, would deliver the bonds and coupons to plaintiff, when plaintiff demanded them? A. Yes.

"13. Before the defendant furnished funds to pay his check, and before the commencement of this action, did plaintiff fully inform defendant of the nature of plaintiff's claims for said bonds and coupons, and demand possession of the same, and offer to pay said defendant the said $3,100? A. Yes.

"14. On the 30th day of June, 1877, when plaintiff tendered the $3,100, and demanded the bonds and coupons, were

the bonds and coupons still in the bank, and could Angell Matthewson have caused them to be delivered to plaintiff? A. Yes.

"15. Did the said defendant have such control of the bonds and coupons when plaintiff demanded them, and when this action was commenced, that he could have caused their delivery if he had pleased to do so? A. Yes.

"16. Was the transfer of the bonds and coupons by Matthewson to Meixell on June 30th made upon the condition that Matthewson would take them back when Meixell got tired of them? A. In our opinion, there was no transfer made.

"17. Did Meixell, on July 2, 1877, transfer a half-interest in said bonds and coupons back to Matthewson without plaintiff's knowledge? A. In our opinion no transfer was made.

"18. From all the circumstances of the case, is the jury of the opinion that the transfer of the bonds and coupons by Matthewson to Meixell on June 30, 1877, and a transfer of a half-interest thereof back from Meixell to Matthewson on July 2, 1877, was a fraudulent scheme entered into by them to defraud plaintiff of the benefit of his purchase, and to appropriate the bonds and coupons to their own use? A. Yes.

"19. Was the assignment of the judgment by plaintiff to Matthewson's wife procured by Mr. Ayres, the attorney of Matthewson, by Matthewson's direction, and was said assignment intended and understood only as a compromise or settlement between Matthewson and plaintiff of the judgment which plaintiff held against him? A. Yes.

"20. Was it understood between Mr. Ayres, the attorney of Matthewson and plaintiff, at the time the assignment was executed, that it should operate only as a compromise of the judgment, and should not affect plaintiff's claim against defendant Meixell? A. Yes.

"21. Was the assignment procured by Matthewson for his own benefit by his attorney without any directions from Mrs. Matthewson? A. Yes.

"22. Was the $500 the only consideration paid to plaintiff for the assignment? A. Yes.

"23. What was the value of the bonds and coupons at the time of the conversion of them by the defendant? A. $9,475."

Interrogatories which the defendant submitted to the jury to answer:

"1. Did the plaintiff agree with J. L. Forsyth to buy from

him the bonds in controversy and obligate himself to pay for them? A. Yes.

"2. If yea, was such agreement in writing; when was it made, and by what instrument in writing is it evidenced? A. Yes; June 15, 1877.

"3. Did the plaintiff and J. L. Forsyth enter into a written agreement by the terms of which the bonds in controversy were reserved for and the refusal of them given to the plaintiff for a definite length of time? If so, when was it made; for what length of time were they reserved; where and by whom were they to be held; and what price was he to pay for them? A. Yes; June 15, 1877; reserved until July 1, 1877; First National Bank of Parsons, Kansas, and held by Angell Matthewson; $3,100.

"4. Were the bonds on deposit in the First National Bank of Parsons on the 30th day June, 1877? A. Yes.

"5. By the established regulations of the First National Bank of Parsons, what hours of day was the bank open for business purposes? A. From 9 A. M. to 3 P. M.

"6. Did the defendant buy the bonds in controversy from Angell Matthewson late in the afternoon of June 30, 1877? A. In our opinion, the evidence does not prove a purchaser.

"7. Was it before or after the sale of the bonds by Matthewson to Meixell, that plaintiff appeared and offered to pay for and receive them? A. In our opinion, the evidence does not prove a sale.

"8. What hour in the day of June 30, 1877, did the plaintiff first demand the bonds? State definitely. A. Between the hours of 4 and 5 o'clock P. M.

"9. For what price did Matthewson sell said bonds to defendant, Meixell? A. In our opinion, the evidence does not prove a sale.

"10. Did the defendant, Meixell, afterward sell half of said bonds to Matthewson? If so, when, and for what price? A. No.

"11. Did G. W. Hawk make a sale in May, 1879, of a $50 matured coupon of Fredonia city bonds, of the same issue of which the Fredonia bond in controversy is one, to Isaac Hudson, for $20? A. Yes.

"12. What was the market value of the bonds in controversy on the 30th day of June, 1877? A. $9,475.

"13. Did the plaintiff execute the assignment to Mrs. Cornelia Matthewson, which has been read in evidence? A. Yes.

"14. If so, state when it was made, and what he received for it.   A. $500.

"15. Has Angell Matthewson since that assignment was made, paid in full to Cornelia Matthewson the judgment recovered by the plaintiff against Matthewson, mentioned in said assignment?   A. In our opinion he has not."

On September 18, 1883, the trial court rendered judgment thereon, and modified the original judgment of February 8, 1878, to the effect that the plaintiff was entitled to the bonds in controversy, but in case a delivery thereof could not be had, the plaintiff was entitled to recover of the defendant $8,430 — the value of the bonds and coupons, less the contract-price of $3,100, and the $500 received by Kirkpatrick from Matthewson.   Judgment for costs was also rendered.   *Meixell* excepted, and brings the case here.

*Webb & True,* for plaintiff in error.

*Hutchings & Denison, T. J. Hudson,* and *S. S. Kirkpatrick,* for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: This case, with the matters growing out of it, has already demanded much time and attention of this court. (25 Kas. 13; 25 id. 19; 28 id. 315; 29 id. 679.) At the May Term, 1881, of the trial court, Kirkpatrick, plaintiff below, had judgment for $7,500 and costs against Meixell, defendant below.   That judgment was reversed solely on the ground that the instruction of the court, as to the measure of damages, was misleading, and that the value of the bonds in controversy as returned by the jury was excessive. (*Meixell v. Kirkpatrick,* 29 Kas. 679.)   In the opinion rendered at that time, Mr. Justice BREWER, speaking for the court, said:

"We do not doubt that a municipal bond so far resembles an ordinary chose in action that, where no evidence of value is offered, its face value is to be deemed the market value, and to this extent the instruction of the court is beyond criticism; but we think that it must be also conceded that such securities have become so abundant, and so much received as an

19 — 33 KAS.

article of ordinary commerce, that they possess, strictly speaking, a market value; and when such market value is shown, that is to be deemed as the measure of damages for any conversion."

In view of the results attending the former trials of this case, and the several decisions of this court upon the questions at issue between the parties, we would have supposed upon a retrial of the case that the market value of the bonds would have been fully established by the defendant Meixell; or at least that he would have introduced all the evidence obtainable by him on the subject of their market value.    We are more than surprised, however, when, from an examination of the record, we find that a large number of depositions had been taken by the defendant showing the market value of the bonds to be from fifteen to forty cents on the dollar flat, and that no effort was made to introduce these depositions as a part of the defense.    Until the plaintiff below was permitted to give evidence in rebuttal, these depositions of market value were not offered.    Objection was then made by the plaintiff below, because they were proposed to be read after the defendant had closed his defense, and also for other reasons.    The court sustained the objection.    The apology now given for the nonintroduction of the depositions, showing the market value of the bonds by Meixell in making out his defense, is that no evidence of value was given by or in behalf of Kirkpatrick, in making his case; therefore that Meixell felt justified in resting the value of the bonds upon the proof of three sales, viz.: 1st. All the bonds and coupons from Matthewson to Meixell, on June 30, 1877, for $3,100; 2d. Half of the bonds and coupons from Meixell to Matthewson, on July 2, 1877, for $1,550; 3d. One over-due $50 coupon from Hawk to Hudson, in June, 1877, or May, 1879, for $20.

This apology is insufficient, when we consider that the important question which ought to have been contested in the trial court, was the value of the bonds; that in the absence of any evidence of value, their face value must be considered the market value; that the sales from Matthewson to Meixell, and

from Meixell to Matthewson, were not sales in the ordinary course of business; that Meixell purchased — if there was any sale to him from Forsyth — after notice that Forsyth had sold the bonds to plaintiff below; that Matthewson had the same notice; that the circumstances of the transaction look very much like collusion between Forsyth, Matthewson and Meixell to deprive Kirkpatrick of the bonds by a colorable sale; and that the single sale of one over-due coupon of $50 only would not establish a market value for the bonds.

Again, the contract-price of the·bonds between Kirkpatrick and Forsyth furnishes no fair criterion of the market value, as at that time it was not generally known that the supreme court of the United States had declared them valid obligations, and therefore in the market the bonds were then under a cloud. After Meixell had rested his case and Kirkpatrick had given evidence in rebuttal, the former was not entitled, as a matter of right, to introduce his evidence showing the market value of the bonds.     It is contended, however, that the court abused its discretion in not permitting this evidence to be received after Kirkpatrick came back to the stand and testified that in his interview with Meixell on July 1, 1877, he informed him that the bonds were worth one hundred cents on the dollar. Not so.     This evidence was offered only as impeaching testimony; (*Kelsey v. Layne*, 28 Kas. 218;) and the court expressly instructed the jury that it was introduced for the purpose of impeaching Meixell, and was "not to be considered by them as evidence of the market value of the property in controversy."     Moreover, Meixell was permitted to testify after Kirkpatrick had been recalled, that the latter did not say to him on July 1, 1877, or at any other time, that the bonds were worth one hundred cents on the dollar.

Counsel complain severely of the charge of the court, relating to the market value of the bonds, as being erroneous. These alleged errors are threefold : 1st. That the jury were not distinctly directed to ascertain the value of the bonds and coupons at the time of conversion, and therefore that they were permitted to fix the value thereof at the time of trial; 2d. That

the court should have directed the jury that there was evidence before them of the value of the bonds and coupons, other than their face value; and that it was the further duty of the court to say to the jury they should be governed entirely by the market value, and give no attention to the par or face value; 3d. That the court gave paramount importance to the face value of the bonds in its directions to the jury, and did not comply with the rule as to damages declared in *Meixell v. Kirkpatrick*, 29 Kas. 679.

These objections are without force. The court said to the jury:

"Where evidence has been been introduced showing the market value at the time of conversion, such market value governs; but where no evidence of value is introduced, then the face value is to be deemed the market value."

Again, the court said to the jury:

"You should ascertain the value of the bonds at the time of conversion by the following rule: *Prima facie* the value is the amount due on them, both principal and interest; you should, however, in ascertaining their value, consider any and all evidence, if any has been introduced, which tends to diminish their value, and make your estimate accordingly. Having fixed the value at the time of conversion by the above rule, you should deduct therefrom $3,100, being the contract-price, and the $500 paid Kirkpatrick for the assignment of the judgment against Matthewson, making $3,600 in all to be deducted; and upon the remainder you should compute interest at the rate of seven per cent. per annum from the date of the conversion, and add such interest to such remainder. The sum found by such computation will be the value of the bonds to be inserted in your verdict, in case you find for the plaintiff."

Further, the special findings show that the jury valued the bonds at the time of the conversion at $9,475. Therefore it is clear that the jury understood they were to find the value of the bonds at the time of the first unlawful detention, and that they fixed their value as of that date. The jury were expressly informed that—

"Evidence of the price for which the bonds in controversy, or like bonds and coupons, were sold, was some evidence of

their market value at the time of such sales, and that where
such evidence was given, they should take it into consideration
for what it was worth in estimating the market value of the
bonds."

As the sales proved were anomalous ones rather than sales
made in the ordinary course of business, the court would have
clearly erred if it had directed the jury that they "were to be
governed entirely by the sales, and were to give no attention
to the par value or face value of the bonds." Market value
signifies a price established by public sales, or sales in the way
of ordinary business. (*Murray v. Stanton*, 99 Mass. 345.)
The instruction upon the measure of damages was in substan-
tial compliance with the law declared by this court in *Meixell
v. Kirkpatrick*, supra, and while the trial court did refer to the
face value of the bonds, it further stated, "that it was only in
the absence of any testimony as to the value that the jury were
to take the face value of the bonds in controversy as their
market value." In the instruction containing the words
"which tends to diminish their value," we understand that
the court meant "which tends to diminish their face value."
As thus read, it is not subject to the criticism made against it.
Had the defendant below introduced to the jury the evidence
in his possession of the market value of the bonds at Lawrence,
St. Louis, and other places, there would have been stronger
evidence of the market value of the bonds than any offered
before the trial court; but as no evidence of market value was
offered, excepting the sales already commented upon, it is not
strange, although unfortunate to Meixell, that the jury were
largely controlled by the face value of the bonds.

It is charged that the court erred in giving judgment for
Kirkpatrick against Meixell, for the reason that the special
findings of the jury were inconsistent with the general verdict
in showing that Meixell did not detain the bonds. True, the
jury did find that Matthewson did not sell the bonds to
Meixell; that Meixell did not give his check for the bonds;
that subsequently Meixell did not sell any of the bonds to
Matthewson; and that Matthewson had the actual possession

of the bonds at the time Kirkpatrick made a demand therefor. If these were the only findings of the jury, it might be said with truth that the special findings were in conflict with the general verdict, but other findings of the jury do away with the seeming inconsistency. Thus, the jury found that—

"From all the circumstances of the case, the transfer of the bonds and coupons by Matthewson to Meixell on June 30, 1877, and the transfer of a half-interest thereof back from Meixell to Matthewson on July 2, 1877, was a fraudulent scheme entered into by them to defraud Kirkpatrick of the benefit of his purchase, and to appropriate the bonds and coupons to their own use."

Again, the jury found that Meixell "had such control of the bonds and coupons when Kirkpatrick demanded them, and when this action was commenced, that he could have caused their delivery if he had been pleased so to do." Under these latter findings and the allegations of the answer that Meixell claimed the bonds as his own, the trial court was justified in rendering judgment against Meixell upon the general verdict, even if he had not purchased them from Forsyth or Matthewson. If he was in an arrangement to defraud Kirkpatrick and wrongfully deprive him of the possession of the bonds, and such bonds were under his control, the custody of them by Matthewson was also the possession of Meixell. Meixell in his answer insisted that he had purchased the bonds, paid for them, and that Kirkpatrick did not own them. (*Shoemaker v. Simpson*, 16 Kas. 43; *Hall v. Draper*, 20 id. 137; *Smith v. Schulenberg*, 34 Wis. 50.)

This brings us to the complaint that all the special findings above referred to were erroneous as being unsupported by the evidence. We do not think so. There is much in the record, outside of the amendments incorporated at the request of Kirkpatrick, tending to show that the purchase by Meixell was collusive rather than actual.

We have not thought it necessary to comment at length upon the alleged errors of the court in permitting Kirkpatrick to testify to a transaction had personally with Forsyth; in ad-

mitting in evidence a bill of sale of the bonds in controversy, purporting to have been executed by Forsyth to Kirkpatrick on June 15, 1877; and in refusing to permit Meixell to introduce in evidence a written notice to Matthewson, purporting to have been executed by Forsyth on June 14, 1877, notifying him that he had given Kirkpatrick the refusal of the bonds for $3,100, to be paid any time before July 1, 1877, for the reasons that under the allegations of the answer, Meixell admitted that on June 15, 1877, Forsyth was the owner of the bonds in controversy, and that upon that date Kirkpatrick and Forsyth entered into an agreement whereby Kirkpatrick was to have the refusal of the bonds for $3,100, to be paid before July 1, 1877, and as the memorandum in the answer shows that Kirkpatrick performed his part of the contract when he offered to pay to Matthewson on June 30, 1877, the contract-price. Owing to the allegations of the answer, it was only necessary for Kirkpatrick to prove that Meixell had notice of the contract existing between him and Forsyth prior to his offer to perform his part thereof on June 30, 1877; that Meixell's purchase, or pretended purchase of the bonds, was prior to his demand; that he tendered to Matthewson before July 1, 1877, the amount called for in the written notice set forth in the answer, and the value of the bonds at the time he made a demand therefor.

There has been very much drawn into the record which is wholly unnecessary, considering the pleadings, and many matters which otherwise would be material, if Meixell had relied wholly upon a general denial, are no longer matters of substance. Some of the errors alleged are mere irregularities which did not and do not prejudice the rights of the complaining party. It is well settled that "whatever is admitted in a special defense operates so far as a modification of a general denial." (*Wiley v. Keokuk*, 6 Kas. 94; *Butler v. Kaulback*, 8 id. 668.)

Counsel for Meixell denominate the judgment "a high-handed robbery in the name and form of law," and allege that the case-made, owing to the insertion of certain amendments over their objection, does not fully present to this court "the

wrongs actually done" upon the trial. As the amendments are so presented that we have before us the case as originally prepared, as well as the case after it was settled, we have taken particular care to read the original case prior to the allowance of the amendments. Therefore we are in the condition to say, apart from a consideration of the amendments allowed, that there is not much in the case, as prepared, calling for sympathy for Meixell.

These facts clearly appear from the record as originally made by the counsel now complaining of its mutilation: That on June 15, 1877, J. L. Forsyth was the owner of the bonds in controversy; that on that day, Kirkpatrick entered into a contract with him for the refusal of these bonds for $3,100, to be paid before July 1, 1877; that Matthewson, the president of the First National Bank of Parsons, in this state, had the control of the bonds; that on June 30, 1877, Kirkpatrick tendered to Matthewson $3,100; that Matthewson said the money was all right; that the tender was good, but that he had sold the bonds to another man, in obedience to instructions from Forsyth; that the excuse for selling them to Meixell, and not keeping them for Kirkpatrick, was, that Kirkpatrick did not tender the $3,100 — the contract-price — before the close of banking hours of said June 30; that neither of the contracts offered in evidence required that Kirkpatrick should make the tender of the contract-price during banking hours; that Meixell, then a director of the Parsons Savings Bank, on June 17 or 18, 1877, was informed by its president, Matthewson, or by its teller, Hawk, of the contract between Forsyth and Kirkpatrick concerning the bonds; that Meixell, on June 30, 1877, went to the Parsons Savings Bank, and about 4 o'clock of that day made some arrangements with Matthewson by which he was to have the bonds, or some interest therein; that Matthewson testified that Meixell took the bonds for $3,100, and gave the bank his check in payment therefor; that Matthewson also testified that he sold the bonds to Meixell as an officer of the bank, and afterward bought one-half of them back as an individual, and paid $1,550 for them to Meixell;

that on June 30, 1877, or July 1, 1877, Kirkpatrick called upon Meixell and told him that he wanted the bonds, and would pay for them; that Kirkpatrick was willing to give the townships which had issued the bonds the benefit of his purchase, and so told Meixell; that Meixell refused to turn over any of the bonds to Kirkpatrick; that Kirkpatrick testified that Matthewson "urged Meixell to turn over the bonds to him," saying "he would give him back his money;" that Scudder testified that Meixell answered Kirkpatrick, "that he had bought the bonds, and if there was anything in them, he wanted to make it;" that soon afterward, Kirkpatrick commenced this action to recover the bonds, or their value; that Meixell has vigorously resisted the claim of Kirkpatrick ever since his demand.

Upon these facts, the right to the bonds, or their value, is clearly with Kirkpatrick; in fact, Meixell should have returned the bonds to Kirkpatrick when they were demanded. Meixell was a purchaser — if he made any purchase — with notice of Kirkpatrick's rights, and therefore, after Kirkpatrick tendered the contract-price to Matthewson, Meixell was not entitled to claim or detain the bonds. We deem it a misfortune to Meixell that the market value of the bonds was not fully established by him in making his defense; but for this Kirkpatrick is not responsible. The record does not disclose that Meixell has parted with all of the bonds. He may, therefore, deliver the bonds and coupons in his possession in satisfaction of the judgment *pro tanto*, and if he is unable to return all, he will be liable only for the remainder of the judgment, if any remains.

We perceive no error on the part of the court in refusing the application of Meixell to withdraw the answer and file a new or amended answer. This application has been twice presented before to the court for consideration, and no exceptions seem to have been taken upon such prior presentations. The motion was renewed a third time without leave. (*Adams v. Lockwood*, 30 Kas. 373.)

Wc have examined all the other questions presented in the briefs, but do not think it necessary to refer specially to them. The judgment of the trial court will be affirmed.

All the Justices concurring.