No. 47,725

KEITH CHASTEEN, *Appellee*, v. GLEN CHILDERS, *Appellant*, and AMERICAN QUARTER HORSE ASSOCIATION and THOMAS W. BROOKS, *Appellees*.

(546 P. 2d 935)

Opinion filed January 24, 1976.

*C. Bruce Works*, of Topeka, argued the cause and was on the brief for appellent.

*Thomas W. Brooks*, of Overland Park, argued the cause, and *William D. Hamblin*, of Overland Park, was with him on the brief for appellees.

The opinion of the court was delivered by

FATZER, C. J.: This is an appeal from a judgment in favor of

the plaintiff-appellee, Keith Chasteen, and third-party defendant, Thomas W. Brooks, in an action brought under the provisions of the agister's lien law (K. S. A. 1974 Supp. 58-207 *et seq.*) to assert and enforce a statutory lien on certain horses for their care and keep.

The plaintiff-appellee owned some 400 acres comprised of five tracts of land in Sections 17 and 18, Township 12 South, Range 18, East of the Sixth Principal Meridian in Douglas County, Kansas. The land was on the north and south of U. S. Highway 40, east of Big Springs, Kansas.

In 1971, the defendant-appellant, Glen Childers, rented 70-100 acres of pasture from a Mr. Young who lived in the farmhouse and was then in possession of the property generally described above. The pasture rented was good brome grass. The appellant inspected the fence and its condition was good. It appears that the pasture had been under an oral lease in favor of the appellant from Mr. Young in 1970, and that they had a similar oral agreement in 1971. Young apparently abandoned the farm late in October, 1971.

During the middle of October, 1971, and pursuant to his oral agreement with Young, the appellant put five thoroughbred mares and one saddle horse in the pasture. Sometime around November 1, 1971, Chasteen visited the farm, found the appellant's horses either confined in his pasture or running loose upon the public highway adjoining his premises. Chasteen also found the farmhouse was in shambles, machinery was missing or parts taken, and the farmstead was generally in disrepair. Chasteen then entered into a written contract leasing the property to a Mr. Henry of Lecompton and also gave his attorney, Mr. Brooks, authority to go to the farm and pick up the five thoroughbred mares and the saddle horse. Mr. Brooks contacted Mr. Ray K. Miller, Jr., Route 2, Lee's Summit, Missouri, who was in the stabling and horseshoeing business, about pasturing the horses on his farm near Lee's Summit. Mr. Miller testified by deposition:

"My dealings with Thomas Brooks were in person in Lee's Summit on a Sunday afternoon in 1971 and he wanted information regarding caring for seven head of horses *that he owned.* Mr. Brooks came out to the farm and asked what facilities we had and I told him we could either box stall horses or put them in pasture and *he indicated that these were pleasure horses that he and his wife owned and that they hadn't been riding them and needed a place to keep them.*

"This conversation took place the last week of October, 1971. The latter part of October or first of November, 1971, I had a telephone conversation with Thomas Brooks by phone and he made arrangements for me to transport a certain number of horses from Lawrence, Kansas to Lee's Summit. I was to meet him at Denny's Restaurant in Olathe and I met him on that morning. Thomas Brooks is the attorney from Overland Park. I met Mr. Brooks at Denny's Restaurant and he apologized for delay. He was about an hour and a half late. He instructed me to go to Highway 10 north of Olathe and wait because he had other business and I met him there. We drove to Lawrence, actually it was closer to Topeka, it sets in between the two towns, and Mr. Brooks indicated the horses would be caught for us to back our trailers in, pick up the horses and leave. When we got there the horses were . . . not penned up. When I saw the horses, they were sweaty and excited.

"The perimeter fence [around the pasture] that the horses had been in was in good condition, the makeshift corral had the fence down and there were no horses out on the road when we arrived." (Emphasis supplied.)

The horses were in excellent shape when Miller picked them up on November 5, 1971. On the same day, a pasturing agreement was entered into between Brooks and Miller, for care of the horses at Lee's Summit. The horses were to be put in an 80-acre pasture with 40 other horses, watered and fed hay twice daily. Nothing additional could be done for them, including veterinarian care, without Brooks' consent in advance. The agreement specifically provided that Brooks was to pay $12.50 per month per horse for feeding and watering seven horses. The extra gelding picked up by Miller did not belong to Childers. It should be noted that the number of horses is sometimes referred to in the record as six and sometimes as seven. The record indicates Childers put his horses in this pasture in the middle of October, 1971. He took three mares and two fillies, which were thoroughbred horses, and a sixth horse, which was a gelding and not a thoroughbred. On November 7, 1971, he checked and found his horses were gone. He checked with the house adjacent to the pasture, and asked the occupants if they knew where the horses were. He was directed to see Mr. Henry. Childers talked to Henry and he directed Childers to get in touch with Brooks, which Childers did that Sunday evening the 7th of November, 1971.

Childers called Brooks by telephone in Overland Park, and we quote from the record:

"Q. Which town?

"A. Overland Park, I believe. I told him that the horses were mine and that they were gone, and asked him if he knew where the were at, if he would help me get them. *And he made the statement to me that they were not mine, that they were Mr. Chasteen's, that he had bought these horses in Texas,*

*and that they were not my horses, and I said, well, I had proof that they were my horses.* And he said, well, somebody had tore up the house and he wasn't even considering what I was asking him. And he said that he would get in touch with Mr. Chasteen and determine more about these horses. And I said, well, I would sure like to get something done, get my horses back. If they were my horses I could prove that they were my horses. And he said he rather doubted it. That he said they were Mr. Chasteen's horses.

"Q. Did you tell him they were thoroughbred horses?

"A. Yes I did. I told him that they were valuable horses.

"Q. Did you describe the horses to him?

"A. Yes, I believe I did describe the horses to him." (Emphasis supplied.)

Childers asked Brooks where the horses were, and got no satisfactory response.

On November 11, 1971, Childers talked to Chasteen at his hotel in Kansas City, Missouri. The record reflects:

"Q. What was your conversation with him as best you can recall?

"A. I told him my name and that I rented this pasture from Mr. Young and put these horses in there. And that I called Mr. Brooks and tried to retrieve the horses and that I couldn't get any satisfaction from him. And I felt by not being able to get any satisfaction from him, I felt I should talk to Mr. Chasteen. And stated to Mr. Chasteen that Mr. Brooks indicated to me that the horses were not mine, that they were Mr. Chasteen's horses. Mr. Chasteen told me, he said, no, these horses are not mine. He said I picked the [his] horses up in the spring. And so I asked Mr. Chasteen if it was possible that I could get the horses back. And he said he turned it over to his attorney and that he would take care of it. And I would have to correlate it with him. I again told him that I didn't have any luck with his attorney and that is why I was there. And I asked him why he picked up the horses. *And he said he gave his attorney the authority to go over there and get anything he could get his hands on.* Mr. Chasteen pulled out his checkbook and showed us where he had given Mr. Young various amounts of money and he was very disturbed with Mr. Young about the money that he had given him and he had no results in getting it back and so forth.

"Q. Did he admit Mr. Young was a tenant on his property there at Lecompton?

"A. *I think the words that he told me Mr. Young had nothing to do with it.*

"Q. Did Mr. Chasteen tell you where your horses were?

"A. No, he didn't.

"Q. What else did he tell you, if anything?

"A. Well, he kept—I asked him several times that I would like to get the horses back before there was too much expense involved. And he said, well, he said you just work that out with my attorney. He stated, I hired this young aggressive attorney to take care of this and that is his job. And he said I don't want nothing to do with it. And I said, well, I have had very unsatisfactory dealings with Mr. Brooks, that I would like to do something about getting the horses back. And I said I have always found if I can't do busi-

ness with one person I go to the superior. And he said I don't have anything to do with it, you go see Mr. Brooks." (Emphasis supplied.)

A week or so after the above conversation with Chasteen, Childers again called Brooks by telephone. We quote from the record:

"Q. What was that conversation as best you can recall?

"A. Still trying to get my horses back. And he said he hadn't determined who the horses belonged to and that he had felt that they were Mr. Chasteen's horses. And I told him at this time Mr. Chasteen told me that they were not his horses, that he had taken his horses out in the spring. But I still couldn't get any satisfaction from him.

*   *   *   *   *

"Q. Did he ever make a demand on you for money?

"A. Some time later. I believe it was in December he started making demands.

"Q. What was that demand, if you know, sir?

"A. I don't remember the exact amount. But I do remember that he indicated that he was paying thirty or $35 for boxed stalls for them. And at that time I realized that if this was what he was paying they weren't being adequately cared for."

On December 22, 1971, Brooks wrote a letter to Childers' lawyer, which we quote in part:

"In any event, in late October it became apparent that considerable damage had been done to the farmhouse, that the septic tank had been torn up, that 90% of Mr. Chasteen's farm machinery had either been converted or sold and that there were seven horses running loose with no apparent indicia of ownership.

"We were fortunate to enter into a farm lease with Roy Henry of Lecompton, who is now our tenant; however, some provision had to be made for the horses as they appeared to be good stock and there was a possibility in my mind that they could have been the same horses that Mr. Chasteen purchased at auction in North Texas in June of 1970. *I had them transported to the Greater Kansas City area where they are being boarded, fed and cared for in boxed stalls at the rate of $30.00 per month apiece. Transporting the horses to Kansas City ran a little over $100.00. Rabies shots by a veterinarian ran $15.00.*

"As I will be leaving town in the very near future, *I do not believe there would be any possibility of resolving the matter amicably until about the middle of January.*

"*There is still some question in my mind as to whether or not Mr. Childers owns the horses.* I would therefore appreciate your furnishing papers on each of the horses so that the ownership can be verified." (Emphasis supplied.)

On February 25, 1972, Chasteen commenced this action in the district court of Douglas County. The question of venue was raised and on April 7, 1972, the case was transferred to Shawnee County. We quote from the petition:

"That the plaintiff brings this, his petition, under the provisions of K. S. A. 58-207, and is attempting to assert and have enforced a statutory lien upon property in his possession for the care and keeping bestowed upon the aforesaid horses."

The prayer was that Chasteen recover a money judgment in the amount of $1,020 against Childers, and that the agister's lien asserted by Chasteen be foreclosed and the horses sold to satisfy the judgment.

During the month of May, 1972, Brooks admitted to Miller he did not own the horses and asked Miller to return them to Childers.

On June 1, 1972, Childers filed his answer and cross petition in which he asked for $26,000 actual damages and $25,000 punitive damages. On the motion of defendant, Brooks was made a party defendant and the cross petition was amended to include him.

A trial was had to a jury and at the conclusion of all the evidence the district court announced oral findings of fact and conclusions of law and directed a verdict for the plaintiff, Chasteen, and the third-party defendant, Brooks. The district court found the appellee, Chasteen, was entitled to the relief prayed for under the provisions of K. S. A. 1974 Supp. 58-207, and further found that under the undisputed evidence the horses were under the exclusive control of Miller as an independent contractor, and that Chasteen and Brooks had no liability for damages thereto. Childers perfected this appeal.

Did the district court properly base its ruling on K. S. A. 1974 Supp. 58-207? The appellant argues that under the undisputed facts neither K. S. A. 1974 Supp. 58-207 nor any other statutes furnished the appellees any relief for maintenance of the horses in the manner in which they were taken and removed from the state of Kansas. He contends the appellees had exclusive control of the feeding and care of the horses while they were in Miller's pasture, and that when the appellees voluntarily surrendered them to the appellant in May, 1972, any claimed lien was abandoned under K. S. A. 58-215. The appellant further contends that the provisions for taking up stray animals pursuant to K. S. A. 47-229 *et seq.* should control.

We first consider K. S. A. 1974 Supp. 58-207 upon which the appellees relied and the district court granted relief. The statute reads in part:

"The keepers of livery stables, and all others engaged in feeding horses, cattle, hogs, or other livestock, shall have a lien upon such property for the

feed and care bestowed by them upon the same, and if reasonable or stipulated charges for such feed and care be not paid within sixty (60) days after the same becomes due, the property, or so much thereof as may be necessary to pay such charges and the expenses of publication and sale, may be sold as provided in this act."

It is clear that neither of the appellees were the "keepers of livery stables" nor were they "engaged in feeding horses." One was a member of the bar in Johnson County and the other was an absentee landowner living in a hotel in Kansas City, Missouri. The district court placed considerable reliance on *Kelsey v. Layne*, 28 Kan. 218, in finding that K. S. A. 1974 Supp. 58-207 was applicable to the present controversy regardless of the requirements mentioned. *Kelsey* is not a precedent under the facts in this case. The following is quoted from the opinion:

". . . Now it appears from the plaintiff's testimony that the defendant had for a series of years been keeping and feeding his stock. This is not a case where a farmer has only for a single season pastured a single head of stock for a neighbor, but where for year after year the party has pastured and fed several head of stock. It is true that she only did this for one person, but still she did it to such an extent and for such a length of time that it seems to us she comes fairly within the protection of the statute. She was engaged in feeding his stock. That, *pro hac vice*, may be considered her business. No one would for a moment seriously contend that a party must engage in it as an exclusive business before becoming entitled to the protection of the statute. . . ." (1. c. 225.)

We now quote K. S. A. 58-215 which reads:

"The voluntary delivery to the owner or claimant of any personal property by any person claiming a lien thereon, as provided in this act, shall be held to be an abandonment of such lien, and such lien may also be waived by special contract."

As indicated, the horses were voluntarily surrendered to the owner, Childers, in May, 1972. The case was not tried until considerable time thereafter. In any event, any lien claimed by the appellees for feed and care of the horses was abandoned by the voluntary surrender of the horses to Childers, and the district court erred in this respect. (K. S. A. 58-215.)

However, there is a more compelling reason why the appellees are not entitled to any relief under their petition. Basically, strays are defined as domestic animals running at large, or found in an enclosure, whose owner is unknown. Strays are defined in K. S. A. 47-229 (*b*) as follows:

" 'Stray' or 'strays' shall mean any domestic animal which is found running at large, contrary to law, *or which may be found in any enclosure other than*

*that of its ownership, and whose owner is not known in the community or whose owner cannot be found."* (Emphasis supplied.)

The provisions for taking up strays are found in K. S. A. 47-230 which reads in part:

"Any person may take up any stray found upon his premises, or upon any public thoroughfare adjoining thereto, *and he shall report such taking up to the sheriff of the county in which the stray is taken up within twenty-four (24) hours after the taking up of such stray.* In giving such notice, the taker-up shall describe said stray to the sheriff by stating the kind of animal, color, weight, size, sex and age, the marks, brands or other distinguishing features of the animal, if any there may be, the place where the animal is kept and the address of the taker-up. The sheriff upon being given such notice shall notify the state livestock commissioner and the owners of all registered brands found on said animal. If the sheriff and the livestock commissioner or his duly authorized representatives find and establish the ownership of said animal, a record to that effect shall be kept, and said animal shall be then released to the established owner: . . . ." (Emphasis supplied.)

K. S. A. 47-236 prescribes the care that a taker-up is required to exercise, which reads in part:

"Any person taking up a stray as hereinbefore provided, shall feed and care for said stray and not injure or abuse it. . . ."

Another statute which is pertinent under the facts and circumstances of this case reads in part:

"If any person shall unlawfully take up any stray or fails to comply with the provisions of this act . . . or shall keep the same out of the county when taken up more than five days at one time before sale, he shall be guilty of a misdemeanor. . . ." (K. S. A. 47-237.)

We are of the opinion that a taker-up must show a strict compliance with the statutory requirements before he is to enjoy any of the rights of a bailee.

This seems to be the generally accepted rule. In 3A C. J. S., Animals, § 129, p. 611, we find the following statement:

"A substantial violation or omission of any essential part of the statute will render the entire transaction void ab initio and may subject the taker-up to liability for resulting damages. Thus if the taker-up fails to give the requisite notice, or incorrectly or insufficiently describes the animal, he becomes a tort-feasor and can acquire no title by lapse of time or continued possession. . . ."

In *Moore v. Hensley,* 189 Mo. App. 326, 175 S. W. 91, after concluding that "a person to acquire any right to the possession of or a special property in a stray must take the steps provided by the statutes," the court continued:

". . . The courts will not recognize a cause of action whereby one

will be permitted to profit by his own wrongful and illegal act. Defendant's possession is no different, so far as recovering for the care and feeding of the hogs is concerned, than it would be if he had knowingly and wrongfully taken and converted the stock to his own use (and in fact that was what his act amounted to). It cannot be the law that one can wrongfully convert stock and then recover charges for feeding and caring for it. . . ." (p. 331.)

See, also, *Brite v. Pfeil,* 334 S. W. 2d 596 (Tex. Civ. App. 1960).

And so here. As the appellees alleged and contended, the horses were found in Chasteen's enclosed pasture, or on the adjoining public highway, without his knowledge and consent, and whose owner was not known in the community or to Chasteen. The evidence was that the perimeter fence of the pasture was good—a six-strand barbed wire fence, but that a corral fence, constructed of barbed wire and board, within the enclosed pasture, was down and could not keep livestock confined. But the appellees made no attempt to comply with the provisions of the statute. No report was made to the sheriff of Douglas County of the taking up of such strays. The sheriff was not informed as to the place where the animals were being kept and the address of the taker-up, nor were other provisions of the statute complied with, such as giving a description by color, weight, sex, mark or brand, if any. The failure of the appellees to comply with K. S. A. 47-230 when they took up the horses constituted an illegal act making them wrongdoers, and their possession was therefore unlawful.

As indicated, Chasteen advised Brooks to go to the farm and "get anything he could get his hands on." On November 5, 1971, Brooks directed Miller to pick up the horses and take them out of Douglas County and to Lee's Summit, Missouri. Previously, Brooks advised Miller, in whose limited care the horses were placed, that they belonged to him and his wife. Two days later, November 7, Childers contacted Brooks by telephone and requested the return of his horses. He informed Brooks he would like to have them back before the expenses for their keep increased. Brooks told Childers the horses belonged to Chasteen. When Childers contacted Chasteen, he was told the horses were not Chasteen's, but that he (Childers) would have to deal with Brooks. Had Brooks and Chasteen turned over the horses when they were first approached by Childers there would have been only a nominal feed bill, no veterinarian bill, and no damage to the horses. But the stalling continued until sometime in May, 1972, and the valuable brood mares were kept on a starvation diet during the winter months.

We conclude that under the undisputed facts in this case, the appellees present no logical theory upon which to recover the cost of feed and care, veterinarian fees, and transportation of the horses. If, as indicated, the horses were taken up as strays, there was no compliance with K. S. A. 47-229 (*b*) *et seq.*, and any possession the appellees exercised over them was unlawful. On the other hand, if they were lawfully on the premises pursuant to a lease to Childers, then the taking up of the horses and removing them out of the state constituted an outright conversion of the horses.

If there was not a conversion at the time of the taking, there most certainly was when two days later appellees refused to return the horses to Childers or disclose the place where they were taken. In *Watkins v. Layton*, 182 Kan. 702, 324 P. 2d 130, we considered the law of conversion and stated:

> "At law a conversion, in the sense here used, is an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of the owner's rights. The intention required is simply and intent to use or dispose of the goods, and the knowledge or ignorance of the actor as to their ownership has no influence in deciding the question of conversion. Where the original taking of property is a conversion and is coupled with *animus furandi* (the intention to steal), it constitutes the crime of larceny. When the taking of property is lawful in the first instance, and it is afterwards converted *animo furandi* to the taker's use, it is not larceny but embezzlement.
>
> "The fact that the act on which an action is based is unlawful and subjects a person to criminal prosecution does not of itself authorize the recovery of exemplary damages, but generally the intentional doing of a wrongful act with full knowledge of its character and without cause or excuse, is malicious and warrants an award of exemplary damages. (*Donley v. Amerada Petroleum Corp.*, 152 Kan. 518, 106 P. 2d 652; *Rusch v. Phillips Petroleum Co.*, 163 Kan. 11, 180 P. 2d 270; and *Hammargren v. Montgomery Ward & Co.*, 172 Kan. 484, 241 P. 2d 1192.)" (l. c. 707.) (Emphasis supplied.)

We now turn to the appellant's cross-petition for damages to his horses. The district court concluded:

> "There is no doubt, and of course the Court appreciates the fact where there is a wrong for damages, that recovery should be allowed. And there is no doubt that the horses were damaged while in the possession of Mr. Miller, the colt running through the barbed wire fence, et cetera. But the Court finds as a matter of law that Mr. Miller was an independent contractor and his negligence, if any, could not be imputed to the plaintiff or the third party defendant."

We do not agree. The appellees took exclusive possession and control of the horses when they were taken up and removed from the pasture and concealed on a farm in Missouri. That being the

case, the appellees were bound by the provisions of K. S. A. 47-236 to see that the horses had proper care and that responsibility could not be avoided by its delegation to another. Neither did the undisputed facts disclose an independent contractor relationship. The contract between Brooks and Miller provided:

"That effective upon the signing of this agreement. Second Party shall assume the upkeep, care, watering and pasturing of said animals for the sum of Twelve and 50/100 [$12.50] Dollars per month per horse."

Miller testified and his testimony is not disputed:

"It was Mr. Brooks' decision to pasture the horses only. About a month after we put the horses on pasture Mr. Brooks informed me, that the mares were going to foal and I suggested to him that we should put them up and feed them grain twice a day and take better care of them because a mare that is going to foal needs better feed than pasture, especially going into the winter. His reply was that he would have to talk to Mr. Chasteen about that but at the present time he wanted to keep them on pasture.

"*I gave them the care, the horses, that Thomas Brooks told me to give them, pasture only. I cautioned him about that, he said he did not at the present time want to put them in box stalls but would take it up with Mr. Chasteen.*

"He looked at the horses four or five times in the entire period of time we had the horses.

"I conferred with Mr. Brooks about veterinary care for these horses and he told me to go ahead and give them the necessary shots they needed and they received tetanus shots only. We had the gelding wormed and I trimmed the horses' hoofs once while they were there and charged for that service.

"During the winter we fed these horses bales of hay.

"The horses were never wormed, to the best of my recollection. Two of the colts the mares had were cut in May, one across the neck. Mr. Brooks found out about the same time I did.

"The latter part of April, I returned these horses to Mr. Childers and all of the horses within 30 days after the latter part of April.

"The condition of these horses, all six of them, had lost considerable weight due to care that Brooks had contracted for through the winter months. They weren't poor but they weren't in the kind of shape mares having foals were supposed to be in. The colt had a pretty severe cut right across the throat, windpipe and jugular vein—if it had been a couple inches deeper, I mean just a little bit deeper, it would have cut out the windpipe and jugular vein. The length of the cut was about a foot.

"The cut was more than several inches deep and I made arrangements to haul the two colts to the vet and Mr. Childers accompanied us.

"I take care of thoroughbred horses, but I maintain them in box stalls. They are turned out for exercise in wood rail arena and working pens, exercise pens, for the reason that thoroughbred horses get excited and will run through fences.

"*Mr. Brooks instructed me to leave these horses in a wire fence.*

"One of the colts had a swollen joint and this is usually caused by not doctering a navel of a colt as soon as possible after his arrival. *I did not*

secure a veterinarian after the colts were born because I had difficulty in contacting Mr. Brooks in that he would not answer my calls. I'd call and leave messages and I told him three times the colts were here and we wanted to know what we should do and he didn't bother to contact us about it and he came out one week end to see them.

"I couldn't give these colts veterinary service without his approval. I returned six horses and gave Mr. Brooks one.

"I first learned that Mr. Brooks didn't own these horses when Mr. Childers was at the farm.

"I returned the two horses, two mares and two colts, the first part of May, 1972, and the remainder of the horses within thirty days. At the time I returned them the horses weren't in the condition they should have been in.

"I had six horses that belonged to Mr. Childers plus two had colts, for a total of eight horses, that were returned to Mr. Childers. *Before I returned the horses to Mr. Childers, Mr. Brooks admitted to me that he did not own the horses, that he asked that they be returned to Mr. Childers."* (Emphasis supplied.)

We are of the opinion that under the undisputed facts Miller was not an independent contractor. In *McCarty v. Great Bend Board of Education,* 195 Kan. 310, 403 P. 2d 956, it was said:

"In general, it may be said that an independent contractor is one who, in the exercise of an independent employment, contracts to do a piece of work according to his own methods and who is subject to his employer's control only as to the end product or final result of his work. (*Krug v. Sutton,* 189 Kan. 96, 366 P. 2d 798.) On the other hand, an employer's right to direct and control the method and manner of doing the work is the most significant aspect of the employer-employee relationship, although it is not the only factor entitled to consideration. . . ." (l. c. 311.)

From the foregoing conclusions we hold the appellees are liable to the appellant for damages and the only issue left in the case is the amount of such damages.

The judgment is reversed with directions to the district court to grant judgment for the defendant on plaintiff's petition and proceed to try as the only issue left in the case, the amount of cross-petitioner's damages for the unlawful taking and the improper care of the horses.

It is so ordered.