No. 48,687

BELGER CARTAGE SERVICE, INC., *Appellant,* v. HOLLAND CONSTRUCTION COMPANY, *Appellee.*

(582 P.2d 1111)

Opinion filed July 15, 1978.

*D. Gary Hunter,* of Williamson, Cubbison, Hardy, Hunter & Whitaker, of Kansas City, argued the cause and was on the brief for the appellant.

*Keith Martin,* of Payne & Jones, Chartered, of Olathe, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

McFARLAND, J.: This is an action by the plaintiff, Belger Cartage Service, Inc., for damage to its crane as a result of an accident which occurred on April 4, 1972. Defendant, Holland Construction Company, counterclaimed for damage to its conveyor and for loss of earnings therefrom. Following a bench trial, the trial court granted judgment to the defendant on its counterclaim in the amount of $7,127.99 and on plaintiff's petition. Plaintiff appeals therefrom.

The trial court made the following findings of fact and conclusions of law:

"FINDINGS OF FACT

"1.   On March 31, 1972, Gerald D. Humble, a foreman for defendant Holland ordered a 30-ton crane from Bud Kuhl, a dispatcher for plaintiff. The request also included that plaintiff supply an operator and oiler for the crane to be used on April 4, 1972.

"2.   On April 3, 1972, dispatcher Kuhl filled out a work order form formalizing the request made on March 31 and indicating the names of operator and oiler to transport and operate the crane.

"3.   The crane was delivered to the Holland Construction Company site by the operator Harlow and the oiler Platz on the morning of April 4, 1972. A copy of the work order was carried to the site by the operator, but there is conflicting testimony as to whether defendant's foreman Humble signed the work order at that time.

"4.   On the reverse side of the work order there appears in small print ten paragraphs attempting to establish the rights and obligations between the parties with respect to the use of the crane.

"5.   The undisputed testimony is that no one read the reverse side of the work order and no one on behalf of plaintiff pointed out the conditions set forth on the reverse side.

"6.   The operator and oiler received all their instructions to report to the Holland site from plaintiff's dispatcher and had no contact or consultation with the defendant prior to the morning of April 4, 1972.

"7.   The operator worked for plaintiff for thirteen years prior to April 4, 1972, and was a member of a union representing employees in his specialized field. The oiler had been employed by plaintiff for eight years; belonged to his respective specialized union; and had worked with the same operator for about six years.

"8.   The crane that plaintiff delivered to the site was approximately two years old and the crane's cable was the original cable, never having been replaced.

"9.   At the Holland site, the Holland employees assisted the oiler and operator

in rigging the crane to lift the defendant's conveyor. The actual lifting of the conveyor by the crane was accomplished by the operator.

"10. The oiler and operator admitted that if the crane had been rigged incorrectly, they would either have corrected it or refused to lift the conveyor.

"11. During the lift the cable broke and the fall of the conveyor damaged the crane and itself. The parties stipulated that the amount of damage to the crane was $8,097.99.

"12. The damage to the defendant's property was $7,127.99.

"13. The cause of the cable breaking was not established with certainty. The cable had not been inspected for some time prior to its lift. The most likely cause was that the angle of the lift caused the cable to break.

"14. The defendant's employees did not operate the crane in any way, but merely assisted in rigging the crane to the conveyor designated for the lift. It is admitted by all parties that the crane had the capacity to lift the conveyor.

"15. The performance of the employees of the parties established that the oiler and operator were in fact employees of plaintiff during the operation of the crane and that only the crane had been temporarily leased to defendant for use.

"16. The defendant produced evidence in support of its claim for damages by way of loss of use and profit. The conclusion of the testimony was that plaintiff was damaged in the amount of $6,500.00. The court finds the plaintiff failed to meet its burden of proof in this regard and that the evidence was remote, speculative and a matter of conjecture or opinion."

"CONCLUSIONS OF LAW

"1. The work order form signed by plaintiff's dispatcher and defendant's foreman was just that—an order for the lease of equipment at a certain time and an acknowledgement of the receipt of the equipment. The various provisions on its reverse side in fine print were not discussed or contemplated by the parties to be a contract setting forth the rights and obligations of the parties.

"2. For one party to contract away its legal duty of due care so as to not make them responsible for their negligence through the use of exculpatory clauses is contrary to public policy.

"3. While parties may contract to determine the right to use and control leased equipment, performance of the parties may vary the terms of the contract.

"4. The provisions on the reverse side of the work order form contain clauses against the public policy of Kansas with respect to excusing one party's negligence, and will not be given force or effect. The other provisions of the contract dealing with the right of control of the equipment was varied by the performance of the parties.

"5. The defendant was not negligent in the use or operation of the plaintiff's equipment because defendant did not operate the equipment. Plaintiff is responsible for the damage caused to defendant's equipment and its loss of use because of the negligent operation of the equipment by plaintiff's employees.

"6. Plaintiff is further responsible for defendant's losses because it breached an implied warranty that the equipment was, in fact, fit for the use for which it was intended.

"7. Defendant's claim for its damages is based upon the negligence action, is not barred by the Statute of Limitations and defendant may recover its full loss, including loss of earnings, if proven.

"See: 195 Kan. 51."

"JUDGMENT

"Judgment is entered this date in favor of defendant and against plaintiff in the amount of $7,127.99 and costs."

Accompanying the above findings and conclusions was the following letter from the trial court:

"Enclosed you will find a Memorandum Decision largely in conformity with the findings and conclusions submitted by defendant. In addition, I would make these observations:

"Upon contact from Holland, Belger selected the appropriate equipment to meet the needs of the job. The crane was capable of lifting 60,000 pounds and was two years old. Holland employees made the hookup or attached the cables to the conveyor, including the tag lines. Had the hookup been in error, the Belger employees would have advised the Holland employees. Belger, through its employees, selected the set point. The eyes on the 26,000 pound conveyor were already fastened to the piece of equipment for lifting purposes. Belger employees follow customer's instructions unless they consider them to result in an unsafe condition.

"In the lift of the conveyor within a fraction of a minute the conveyor pulled around into a critical area, the weight shifted the cable to one side, its angle of entering the boom head caused the cable to jump off the schreave or pulley and it frayed and broke. Whereupon, the boom bounded back onto the cab of the crane, jerked the boom out of the crane and tore the cab off the crane, all to the stipulated damage of Belger in the amount of $8,097.99.

"Contemporaneously, the conveyor was damaged extensively. A new piece of equipment would have required approximately a ninety-day delivery period while the damaged conveyor was repaired in ten days at a reasonable cost of repair stipulated to be $7,127.99. The bin and conveyor were new and never before had been in operation.

"The sole cause of the misfortune was the failure of the Belger employees to properly operate the equipment. The 220-foot cable needed to be inspected and replaced when worn. The load involved was an overload at a critical angle but not when properly lifted. The oiler saw the conveyor pulled around into a critical area but failed to warn. There was nothing wrong with the hookup. The operator knew a cable could break if the angle became improper and it was his duty to watch for this problem. The operator can view the end of the boom if he is observing it.

"As to the Statute of Limitations issue on the grounds of negligence, I would direct your attention to 195 Kan. 51, *Rochester American Insurance Company, et al., vs. Cassell Truck Lines, Incorporated, et al.,* which is a 1965 case dealing with the old and the new Codes of Civil Procedure."

The plaintiff-appellant raises numerous points and subpoints of claimed error. All but one of the issues raised are in the area of the legal relationship of the parties, as determined by the trial court.

The defendant (hereinafter referred to as Holland) needed a

crane to move some hea y equipment. To accomplish the moving of the equipment, Holland contacted the plaintiff (hereinafter referred to as Belger). Belger sent the crane, boom, and two employees to the job site. A work order was signed (whether it was signed before or after the accident is disputed). In small print on the reverse of the work order are the following provisions:

"7.   The lessee understands and agrees that all control of and any rights of control ovei personnel and equipment furnished are expressly relinquished and surrendered by Belger Cartage Service, Inc. and assumes the exclusive right to supervise and control them during the continuance of this agreement.

"The lessee specifically agrees that there is a complete surrender of control in regard to the aforementioned employees and equipment and not simply a division of control. This lease is upon the agreement by Belger Cartage that no personnel may be replaced or substituted by Belger Cartage except at the direction and with the approval of the lessee and that the lessee shall have the right to control all of the details of operation of the equipment and personnel furnished.

"The person signing this agreement specifically represents that he has the right and authority to agree to the foregoing terms. Any disputes or disagreements concerning the right of control over personnel or equipment furnished shall be resolved in favor of such control being in the lessee.

"8.   It is agreed and understood that any equipment, or any item which may be delivered, is brought upon or delivered to lessee's premises (including any premises where lessee is engaged in work on account of or in connection with which this work order was issued) at the sole risk of the lessee. It is further agreed and understood that any work performed on such premises is performed at the sole risk of the lessee. With regard to such equipment or deliveries or work performed, Belger Cartage Service, Inc. is hereby relieved from any and all responsibility regardless of its own fault or negligence. Belger Cartage Service, Inc. is further relieved of any responsibility whatsoever for damage to any curb, sidewalk, drive, lawn or appurtenance adjacent to the said premises. In connection with any claims made against Belger Cartage Service, Inc. arising out of deliveries made, equipment furnished or work done in connection with this work order, the lessee hereby indemnifies Belger Cartage Service, Inc. in full (including attorney's fees). This indemnity to Belger Cartage Service, Inc. shall extend to and include any and all injuries to persons and any and all damage to property which may occur on account of the negligence of Belger Cartage Service, Inc."

The two individuals sent by Belger with the crane and boom operated the equipment at all times relevant. Employees of Holland were on the ground operating tag lines. Tag lines are ropes that are attached to the load being lifted to steady and guide the same. When the conveyor was being lifted, the cable on the boom broke. The conveyor fell, damaging it as well as the crane and boom. The only evidence as to the precise cause of the accident was that the conveyor was lifted at an improper angle in relation to the boom. This resulted in the cable rubbing the side of the

pulley, fraying out, and breaking. The evidence indicated the crane and boom were of adequate size and in good working order. The individual operating the crane testified he was aware that too great an angle could result in the cable breaking, knew they were close to the "critical angle" in the lift, but did not think that point had been reached until the cable broke.

Belger contends that its employees became Holland's employees by virtue of the circumstances and paragraphs seven and eight of the work order. Therefore, Belger contends Holland was responsible for the negligence of these individuals. Harlow and Platz, the employees in question, were skilled crane operators and were paid by Belger. Holland paid an hourly rate for the use of Belger's equipment which included any compensation paid the employees. Belger assigned the men to the job. Holland's employees told them what work was to be done. The testimony was clear that Harlow and Platz determined how the work was to be done. The actual operation of the crane was in the control of Harlow and Platz. Only Belger could remove them from the job.

In the law of the master-servant relationship, a number of general criteria have been developed to determine whose servant a borrowed servant is. In 57 C.J.S., Master and Servant, § 566a (1948), the following is stated:

"Where a servant is loaned by the employer to another, the question whether the general or the special employer is liable for his acts while in the special employment generally depends on which one retains the right of direction and control over him and in whose business the servant was engaged while performing the act complained of; in some circumstances both masters may be liable." (p. 284.)

In the matter of control, it says:

"It is not so much the actual exercise of control which is decisive as the right to exercise such control. In order to escape liability, the original master must resign full control of the servant for the time being, it not being sufficient that the servant is partially under the control of a third person; and it is necessary to distinguish between authoritative direction and control and mere suggestions as to details or the necessary co-operation where the work furnished is part of a larger operation. A servant of one employer does not become the servant of another for whom the work is performed merely because the latter points out to the servant the work to be done, or supervises the performance thereof, or designates the place and time for such performance, or gives the servant signals calling him into activity, or gives him directions as to the details of the work and the manner of doing it, or because the servants of the person for whom the work is being performed assist in the work." (pp. 287-288.)

This last statement was quoted in part (but from 39 C.J. 1275)

in *Redfield v. Chelsea Coal Co.,* 136 Kan. 588, 590, 16 P.2d 475 (1932). In the *Redfield* case, a coal mining company made a contract with a truck owner to haul coal from the mine; the truck owner hired the truck drivers and paid them; the foreman of the mine told them when to report to work; the foreman of the mine showed the drivers where to load; and the mine employees would load the trucks. When a truck was involved in an accident with a third party, this court held that the evidence did not prove that the truck driver was an agent of the coal company. We noted that the collision resulted from the manner in which the truck was being operated, something over which the mining company had no control.

In cases involving independent contractors, this court has said that an employer's right to direct and control the method and manner of doing work is the most significant aspect of determining an employer-employee relationship (*Chasteen v. Childers,* 218 Kan. 519, Syl. 5, 546 P.2d 935 [1976]; *McCarty v. Great Bend Board of Education,* 195 Kan. 310, 403 P.2d 956 [1965]).

In *Beitz v. Hereford,* 169 Kan. 556, 220 P.2d 135 (1950), a repairman working on a door of a shop was being helped by employees of the shop; an issue involved was whether they became the repairman's employees while helping him. This court summarized the test:

"Various tests have been employed by courts in determining whose servant a person is at a particular time. Among such tests are:

"Whose work was the person doing at the particular time?

"What person had authority to discharge the workman?

"Who had the right to exercise supervision and control over the workman and to determine the manner in which the work was to be done rather than who actually exercised such control?" (Syl. 2.)

There have been a number of cases from other jurisdictions involving the leasing of a crane and its operator(s), as in this case. A representative sampling of those which held the operator remained the employee of the lender and not the borrower is summarized as follows:

*Harrington v. H.F. Davis Tractor Co. Inc.,* 342 Mass. 675, 175 N.E.2d 241 (1961). Even though the borrower gave the operator direction on what to do, the operator did not become subject to direction and control in the actual management of the crane. The court also stated there is a presumption that an employee remains the servant of the general employer.

*Skornia v. Highway Pavers, Inc.,* 39 Wis. 2d 293, 159 N.W.2d 76 (1968). The court relied on a presumption that the operator remained with the general employer as long as he was on its business. Other factors relevant were that the operator was a specialist, and that he could be substituted by the general employer. The court also noted a rule that a person was not a loaned employee unless the employee consented to change. Because of a lack of evidence to overcome the presumption of continued employment, there was no need to consider the question of "control," but the court did note that merely pointing out work to be done was not control. However, if the operator would need detailed direction, then that might indicate control.

*Lewis v. Barnhill,* 267 N.C. 457, 148 S.E.2d 536 (1966). The court relied on a presumption of continued employment by the original master unless the borrower in fact assumed control of the manner of performance. The test was control of the work as well as the manner of performing it. Factors noted were the experience and skill on the part of the operator and lack thereof by the borrower; operator using his own judgment; lender having the right to substitute another employee; employees being paid by the lender; and the borrower giving requests but not commands.

An example of one case wherein the borrower became the master is distinguished from the case before us in that the lender was not in the regular business of leasing cranes and did not stand to profit (*Western Foundry Inc. v. Matelich,* 150 Mont. 228, 433 P.2d 789 [1967]).

There was substantial competent evidence to support the trial court's findings that Belger, under the totality of the circumstances, was the employer of Harlow and Platz; that their negligence was the cause of the accident; and that Holland was not negligent.

We turn now to the related issue of whether the exculpatory clauses in paragraphs seven and eight of the work order altered the legal relationship of the parties.

In *Kansas City Structural Steel Co., v. L. G. Barcus & Sons, Inc.,* 217 Kan. 88, 535 P.2d 419 (1975), we said:

"The policy of the law in general is to permit mentally competent parties to arrange their own contracts and fashion their own remedies where no fraud or overreaching is practiced. Contracts freely arrived at and fairly made are favorites of the law. (*Kansas Power & Light Co. v. Mobil Oil Co.,* 198 Kan. 556, 426 P.2d 60.) None of the parties here involved were neophytes or babes in the brambles of

the business world. Both companies, it would appear, dealt in projects involving considerable sums of money; both operated substantial business enterprises; and there is no suggestion that their businesses were not capably managed and profitably operated. The trial court did not find the limitation on damages imposed by the exculpatory clause was unconscionable, and we cannot view it as such. The limitation imposed was not total and was agreed upon by parties standing on equal footing." (p. 95.)

However, it should be noted that *Kansas City Structural Steel* involved a delay of delivery issue and a limitation of liability for damages arising therefrom. Further, it arose under the provisions of the Uniform Commercial Code. Active negligence was not involved.

*Hunter v. American Rentals,* 189 Kan. 615, 371 P.2d 131 (1962), involved a rental of a trailer and hitch by a rental company to an individual. The trailer hitch broke. The rental agreement absolved the rental company of any responsibility in the event of accident. This court found that such a contract limiting liability for consequences of one's own negligence was "void as against public policy." Public policy was determined by a statute requiring certain standards for trailer hitches and connectors.

*Hunter* was distinguished in *Talley v. Skelly Oil Co.,* 199 Kan. 767, 433 P.2d 425 (1967), in which this court said:

"As a general rule, an exculpatory clause in a lease voluntarily executed between parties standing on an equal footing, under the provisions of which clause the lessee agrees to indemnify the lessor against risk, loss, damage or injury occurring on the leased premises during the term of the lease, whether or not caused by the lessor's negligence, is a valid clause and enforceable between the parties themselves." (Syl. 1.)

This court noted that *Hunter* was a well-defined exception to the general rule. There was no contention in *Talley* that the lease in question contravened any statute and no "public policy" question was involved. *Talley* involved injury to a third party during lessee's use of the premises. Lessee had complete, actual control over the premises. This factual situation is materially different from the facts at hand wherein lessor retains control of the leased equipment which requires special skill and training to operate, and the operation thereof is potentially dangerous.

As to "public policy," this court defined it in· *In re Estate of Shirk,* 186 Kan. 311, 350 P.2d 1 (1960):

"Public policy forbids enforcement of an illegal or immoral contract, but it equally insists that those contracts which are lawful and which contravene none

of its rules shall be enforced, and that they shall not be set aside or held to be invalid on a suspicion of illegality.

"A contract is not void as against public policy unless injurious to the interests of the public or contravenes some established interest of society." (Syl. 5, 6.)

The rule seems to be that, unless against public policy, a contract exempting liability will be enforced, however, it will be enforced very strictly. In *Cason v. Geis Irrigation Co.*, 211 Kan. 406, 507 P.2d 295 (1973), we said:

"Contracts for exemption from liability for negligence are not favored by the law and are strictly construed against the party relying on them." (Syl. 1.)

In *Kansas City Power & L. Co. v. United Tel. Co. of Kan., Inc.*, 458 F.2d 177 (10th Cir. 1972), a Kansas case, the court found that the specific indemnification clause was not broad enough to require indemnification for losses occasioned by the company's own negligence. The court said:

"The general rule is that private contracts exculpating one from the consequences of his own acts are looked upon with disfavor by the courts and will be enforced only when there is no vast disparity in the bargaining power between the parties and the intention to do so is expressed in clear and unequivocal language. [Citations omitted.] However, the courts have not agreed upon the language necessary to manifest such an intent.   .   .   ." (p. 179.)

The law of "unconscionable" provisions was discussed extensively in *Wille v. Southwestern Bell Tel. Co.*, 219 Kan. 755, 549 P.2d 903 (1976), wherein this court found that in an action by an advertiser against a telephone company for damages by reason of an omission of advertising contracted for the yellow pages, the contract which limited the company's liability for errors and omissions was not unconscionable and contrary to public policy. We noted that disparity of bargaining power, alone, does not render a contract unconscionable.

A summary of the law in this area is provided in 17 Am. Jur. 2d, Contracts, § 188:

"Generally, parties may agree to waive contract, statutory, or other rights unless a question of public policy is involved.

"It is not the rule that any agreement by any person which assumes to place another person at the mercy of his own faulty conduct is void as against public policy. However, the law does not look with favor on provisions which relieve one from liability for his own fault or wrong. It is a well-settled general doctrine that the law will not sustain a covenant of immunity which protects against fraud or relieves one of a duty imposed by law for the public benefit. It has been held that clauses limiting liability are given rigid scrutiny by the courts, and will not be

enforced unless the limitation is fairly and honestly negotiated and understandingly entered into; this is especially true where the contract involves services of a public or semipublic nature, but has also been applied in some controversies involving private contracts, particularly where, as in the case of a public or semipublic contract, the private contract is the only means one of the parties has of filling an important need. A release may be void as against public policy, as where an employer, carrier, or professional bailee is released from liability for future negligence. . . .

"An agreement that facts which the law declares establish a certain relationship do not establish that relationship is void. A person may not shield himself from liability to a third party merely by stipulating with another that he is something which in reality he is not." (pp. 556-557.)

The trial court concluded the exculpatory clause herein was against public policy and that the terms of the clause had been varied by the performance of the parties. Whether any term of a written contract has been modified or waived by a subsequent agreement is a question of fact for the trial court (*Coonrod & Walz Constr. Co., Inc. v. Motel Enterprises, Inc., et al.,* 217 Kan. 63, Syl. 2, 535 P.2d 971 [1975]).

By analogy, a Uniform Commercial Code sales provision (K.S.A. 84-2-316[2]) provides in part:

"to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. . . ."

Kansas has found this conspicuousness to be absent in such cases as *Atlas Industries, Inc. v. National Cash Register Co.,* 216 Kan. 213, 531 P.2d 41 (1975) (disclaimer of warranty in equipment order used much smaller type than rest of contract); and *Christopher & Son v. Kansas Paint & Color Co.,* 215 Kan. 185, 523 P.2d 709, modified on other grounds, 215 Kan. 510, 525 P.2d 626 (1974) (disclaimer in invoice was in smaller type and of same color as rest of writing). See generally Annot., Implied Warranty Disclaimer as "Conspicuous," 73 A.L.R.3d 248 (1976). Also, K.S.A. 1977 Supp. 84-1-201(10) provides:

" 'Conspicuous': A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. . . . Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color. . . . Whether a term or clause is 'conspicuous' or not is for decision by the court."

The exculpatory clause was in small print on the reverse side of the form. Everything on the reverse side was printed. All signatures and "personalized" data were on the front of the order.

There was no evidence that the clauses were discussed or that Holland had actual knowledge thereof. The evidence was disputed as to whether or not the work order was signed before or after the accident.

In determining the enforceability of exculpatory clauses purportedly transferring employees to another and relieving the transferring employer from all responsibility for harm they might cause, such clauses are to be strictly construed against the transferring employer.

In determining the enforceability of any such exculpatory clauses, the trial court may consider the totality of the circumstances surrounding the execution and performance of the contract including, but not limited to, whether the employer to whom the employees were purportedly transferred had knowledge of the clauses by having them pointed out to him or the clauses themselves being conspicuous in the contract; the nature of the work to be performed including the degree of skill required and the degree of risk of harm involved; and the actual performance of the parties.

There was substantial competent evidence to support all of the trial court's findings of fact contained in its memorandum opinion and as expanded upon in its accompanying letter of May 25, 1976.

The remaining issue is whether or not Holland's counterclaim was barred by the statute of limitations. The trial court found Holland could recover on the theories of both negligence and implied warranty. The action herein was commenced on April 4, 1974. It was predicated on an accident occurring April 4, 1972. Holland filed its counterclaim on May 30, 1974.

K.S.A. 60-213(*d*) provides:

"*Effect of death or limitations.* When cross demands have existed between persons under such circumstances that, if one had brought an action against the other, a counterclaim or cross-claim could have been set up, neither can be deprived of the benefit thereof by the assignment or death of the other or by reason of the statute of limitations if arising out of the contract or transaction set forth in the petition as the foundation of plaintiff's claim or connected with the subject of the action; but the two demands must be deemed compensated so far as they equal each other."

By this statute a claim that may be barred by a statute of limitations may still be used as a matter of pure defense but not as an affirmative action (*Lightcap v. Mobil Oil Corporation,* 221 Kan.

448, Syl. 8, 9, 562 P.2d 1 [1977]; *Waechter v. Amoco Production Co.,* 217 Kan. 489, 517-519, 537 P.2d 228 [1975]; *Rochester American Ins. Co. v. Cassell Truck Lines,* 195 Kan. 51, 402 P.2d 782 [1965]).

*Rochester* was the case that the trial court relied upon. In that case we stated in part:

"As a general rule a setoff, counterclaim or cross-claim has the nature, characteristics and effect of an independent action or suit by one party against another. Accordingly, in the absence of a statute to the contrary, a demand pleaded by way of a setoff, counterclaim or cross-claim is regarded as an affirmative action in most jurisdictions, and therefore, unlike a matter of pure defense, is subject to the operation of the statute of limitations. [Citations omitted.]

". . . .

"In *Christenson v. Akin,* [183 Kan. 207, 326 P.2d 313], the court in considering 60-715 [predecessor to 60-213(*d*)], *supra,* said:

" '. . . The counterclaim here being considered grew out of the same contract and transaction which is the basis of plaintiffs' cause of action in their petition. *Although defendants may be barred from affirmative relief because of limitations,* they would seem to have a right to use their counterclaim as a matter of *pure defense* to reduce any judgment received by plaintiffs herein.' (p. 213.) (Emphasis added.)" (195 Kan. at 56-57.)

Had Belger recovered, the negligence claim of Holland could have been used as a setoff. However, Belger did not recover against Holland. Therefore, any recovery on the negligence theory of the counterclaim was barred by the statute of limitations which was two years, pursuant to K.S.A. 60-513. The trial court's conclusion of law No. 7 as follows:

"Defendant's claim for its damages is based upon the negligence action, is not barred by the Statute of Limitations and defendant may recover its full loss, including loss of earnings, if proven."

was clearly erroneous.

We turn now to the issue of breach of implied warranty. The cause of action for breach of implied warranty has a three-year statute of limitations pursuant to K.S.A. 60-512, as follows:

"The following actions shall be brought within three (3) years: (1) All actions upon contracts, obligations or liabilities expressed or implied but not in writing. . . ."

The trial court found that Belger had breached its implied warranty "that the equipment was, in fact, fit for the use for which it was intended." The counterclaim theory of implied warranty was as follows:

"Plaintiff upon renting said crane to the defendant impliedly warranted that said crane was in good operating condition and would be able to lift the conveyor of the defendant and put it in place and also impliedly warranted that its operator knew how to operate said crane and that said crane operator of plaintiff would be able to use said crane in the proper manner to place the conveyor in place and plaintiff breached said implied warranties."

It was broader based than implied warranty of fitness for intended purpose. There was no evidence that the crane was not "fit" for the intended purpose and the trial court found no defects in the equipment itself.

The counterclaim raises the theory of an implied warranty by Belger to complete the job in a workmanlike manner. In *Gilley v. Farmer,* 207 Kan. 536, Syl. 3, 485 P.2d 1284 (1971), this court said:

"Where a person contracts to perform work or to render a service, without an express warranty, the law implies an undertaking or contract on his part to do the job in a workmanlike manner and to exercise reasonable care in performing the work or service. (Following *Crabb v. Swindler, Administratrix,* 184 Kan. 501, 337 P.2d 986.)"

Implied warranty of fitness has been used by this court in a different factual situation in *Global Tank Trailer Sales v. Textilana-Nease, Inc.,* 209 Kan. 314, 496 P.2d 1292 (1972). Textilana-Nease was using Global's tank trailer to haul detergent. The tank collapsed. In reversing the lower court and finding for Textilana-Nease, this court said:

"An implied warranty of fitness has been recognized in connection with bailments made for the mutual benefit of the parties. The rule is that if a bailment is for the mutual benefit of both the bailor and the bailee, such as a let-for-hire agreement, then a higher duty arises on the part of the bailor, the general rule being that, while the bailor is not an absolute insurer against injuries from a defective chattel, he is charged with the duty of inspection to determine whether or not the chattel is fit for the purpose intended. Thus, if the defect were discoverable, he became liable for injuries to the bailee, arising from this unsafe condition, under the theory of an implied warranty of fitness. [Citations omitted.]

"*A fortiori,* Global's knowledge of the material facts and its knowledge of the use to which the tank trailer here in question would be put, requires that Global be held to impliedly warrant the tank trailer to be fit for the use intended and to which it was put by Textilana-Nease." (p. 320.)

In *Franklin v. Northwest Drilling Co., Inc.,* 215 Kan. 304, 524 P.2d 1194 (1974), a well driller was selling the equipment and drilling the well. This court found no implied warranty as to the quantity or quality of the water, only that his work will be in a workmanlike manner, with such skill as may be expected from

one who ordinarily does such work. As to the selling of the equipment, this court said the implied warranty provides that the equipment will be fit for the purpose when the seller knows of the particular purpose for which the equipment will be used. *Franklin* was, however, a Uniform Commercial Code case applying K.S.A. 84-2-315.

A person supplying equipment and workmen to operate the equipment, absent an express warranty, impliedly warrants: (1) the equipment is fit for the intended use; and (2) that the workmen are skilled in the use of said equipment, will do the job in a workmanlike manner, and will exercise reasonable care in performing the work.

The trial court does not specifically conclude that the implied warranty of performance in a workmanlike manner, using reasonable care, was breached, but the findings support this conclusion. The trial court did find that Belger was responsible for Holland's losses due to breach of implied warranty. The trial court apparently considered the employees as a part of the equipment package or unit in reaching this conclusion.

The judgment of a trial court is to be upheld if it is correct, even though the trial court may have relied upon a wrong ground or assigned an erroneous reason for its decision (*Crow v. City of Wichita,* 222 Kan. 322, Syl. 1, 566 P.2d 1 [1977]). We have no difficulty in concluding that the correct result was reached herein.

The judgment is affirmed.